Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ALASKA

3

4    ROBERT BORGEN,

5          Plaintiff,

6       vs.

7    UNITED PARCEL SERVICE,

8          Defendant.

   _____/

9    Case No. A05-0056 CV (JWS)

10                                        **COPY**

11

12

13             DEPOSITION OF ROBERT BORGEN
                 Pages 1 - 137 (inclusive)

14

                    November 3, 2005
15                     9:10 a.m.

16

                 Taken by the Defendant
17                      at
                   Perkins Cole LLP
18        1029 West Third Avenue, Suite 300
              Anchorage, Alaska 99501

19

20

21

22

23

     Reported by:  Caren S. Carlson
24                  Registered Professional Reporter

25

Exhibit B
Page 1 of 49

Case No. A05-056 Civil (JWS)                                          Robert Borgen

---

Page 2

1         A P P E A R A N C E S:
2
   For Plaintiff:
3
     MR. DENNIS ACKER, ESQ.
4       Acker & Associates
     329 F Street, Suite 220
5       Anchorage, Alaska 99501
     (907) 222-2885
6
7     For Defendant:
8       MR. THOMAS M. DANIEL, ESQ.
     Perkins Cole LLP
9       1029 West Third Avenue, Suite 300
     Anchorage, Alaska 99501
10      (907) 279-8561
11
   Also Present:
12
     Mr. Doug Berry
13
14    Taken by:
15      Caren S. Carlson
     Registered Professional Reporter
16
17
18
19    BE IT KNOWN that the aforementioned deposition was
20 taken at the time and place duly noted on the title page,
21 before Caren S. Carlson, Registered Professional Reporter
22 and Notary Public within and for the State of Alaska.
23
24
25

---

Page 3

1  P R O C E E D I N G S.
2         ROBERT BORGEN,
3  called as a witness herein, being first duly sworn to
4  state the truth, the whole truth and nothing but the
5  truth by the Notary, testified under oath as follows:
6        EXAMINATION
7  BY MR. DANIEL:
8     Q.  Will you state your full name for the record,
9  please?
10    A.  Robert Ralph Borgen.
11    Q.  Mr. Borgen, my name is Tom Daniel.  We met
12 before both today and in your arbitration hearing.  And
13 as you know, I'm here today to take your deposition.
14 Because this is a different case from the other two cases
15 in which you're involved, some of the questions will be
16 the same that you've been over before, but some of them
17 will be different and perhaps more detailed than the
18 other two cases.  So I apologize in advance if we're
19 going over some of the same territory, but since this is
20 a different case that may be necessary.
21    How many depositions have you given before?
22    A.  I'm not sure of the number.
23    Q.  Well, you gave one in your Worker's Compensation
24 case; is that right?
25    A.  Right.

---

Page 4

1     Q.  And other than that one, have you ever given any
2  other deposition?
3     A.  I'm thinking there might have been one more, but
4  I'm not sure.
5     Q.  Okay.  Well, just so it's clear what the rules
6  are, you are under oath.  Anything you say here could be
7  used in later proceedings in the federal court or in
8  trial, so it's very important that you understand my
9  questions and answer them truthfully.  So if you don't
10 understand a question that I ask, please let me know that
11 and I will try to clarify it.  Is that agreeable?
12    A.  Yes.
13    Q.  Also, sometimes during a deposition you may
14 think of something later on that you didn't think of the
15 last -- the first time I asked you the question.  So if
16 that happens to you, just let me know and I'll be glad to
17 let you supplement your answer.
18    A.  Thank you.
19    Q.  Is that okay?  Also, we will take periodic
20 breaks, but if you need a break at any time, for whatever
21 reason, just let me know and we'll take a break.
22    A.  Okay.
23    Q.  What is your current address?
24    A.  6930 Sherwood Avenue.
25    Q.  In Anchorage?

---

Page 5

1     A.  Anchorage.
2     Q.  And your Social Security number?
3     A.  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.
4     Q.  And your date of birth?
5     A.  10/2/51.
6     Q.  So you are currently 54?
7     A.  Yes.
8     Q.  And could you tell me if you're married?
9     A.  I'm not.
10    Q.  Have you ever been married?
11    A.  Yes.
12    Q.  And when were you divorced?
13    A.  1995.
14    Q.  Have you been married since 1995?
15    A.  Pardon me?
16    Q.  Have you been married since 1995?
17    A.  No.
18    Q.  What was your wife's name?
19    A.  Mary.
20    Q.  Do you know her maiden name?
21    A.  McGinness.
22    Q.  And how long were you and Mary McGinness
23 married?
24    A.  Approximately 18 years.
25    Q.  Have any children?

---

Exhibit B
Page 2 of 4

2 (Pages 2 to 5)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 6

1   A. Two.
2   Q. And how old are they?
3   A. Well, approximately 27 and 25.
4   Q. And what are their names?
5   A. Justin and Kendra.
6   Q. Kimberly?
7   A. Kendra.
8   Q. Borgen?
9   A. Yes.
10  Q. And do they live here in Anchorage?
11  A. My daughter lives in Anchorage, but she's not
12  here, yes. She's in college.
13  Q. Oh, she's in college. Okay, I was not
14  understanding. Where does she go to college?
15  A. She's in Holland.
16  Q. In Holland?
17  A. Yes.
18  Q. And that's Kendra?
19  A. Yes.
20  Q. And where does Justin live?
21  A. Georgia.
22  Q. And what does he do?
23  A. He's a banker.
24  Q. In Atlanta?
25  A. Yes, one of the suburbs.

Page 7

1   Q. Okay. And does your former wife still live in
2   Anchorage?
3   A. No.
4   Q. Where does she live?
5   A. Georgia
6   Q. In Atlanta?
7   A. I believe so.
8   Q. And were you divorced here in Anchorage?
9   A. Yes.
10  Q. In '95?
11  A. Yes, I believe it was '95.
12  Q. And have you ever been married to anyone other
13  than Mary McGinness?
14  A. No.
15  Q. And does anyone live with you currently?
16  A. No.
17  Q. Has anyone lived with you in the last five
18  years, say?
19  A. Stayed with me, yes.
20  Q. Who was that?
21  A. A girlfriend of mine.
22  Q. What is her name?
23  A. Michelle.
24  Q. Last name?
25  A. Crain.

Page 8

1   Q. C-R-A-N-E?
2   A. C-R-A-I-N.
3   Q. And what period of time did she live with you?
4   A. Up until the first of September she lived with
5   me from 2000, I think, 2001, maybe.
6   Q. Up to September of this year?
7   A. Of this year, yes.
8   Q. And did the two of you split up?
9   A. Yes.
10  Q. And why did you split up?
11  A. We went our separate ways.
12  Q. Was it your decision or her decision or was it
13  mutual?
14  A. I imagine it was mutual.
15  Q. Okay. And let me ask you some questions about
16  your educational background. Where did you attend high
17  school?
18  A. Kenai.
19  Q. At Kenai High School?
20  A. Yes.
21  Q. And did you finish high school?
22  A. No.
23  Q. How many years did you finish?
24  A. I've got 10th grade.
25  Q. And why did you drop out of high school?

Page 9

1   A. Vietnam, military. Vietnam.
2   Q. You volunteered to go --
3   A. I enlisted in the Army.
4   Q. -- in the Army? Okay. What year was that?
5   A. I enlisted December of '68.
6   Q. What was the highest rank you achieved?
7   A. Specialist fourth class.
8   Q. And what was your specialty in the Army?
9   A. I was an 82 Charley, artillery -- air defense
10  artillery surveyor.
11  Q. And what was the period of time that you were in
12  Vietnam?
13  A. I was in Vietnam from May of 1970 to July of
14  1971.
15  Q. And you were in artillery?
16  A. Yes.
17  Q. Okay. Did you see combat?
18  A. Yes.
19  Q. Were you wounded?
20  A. No.
21  Q. Were you injured in any way, physically injured?
22  A. No. If you're talking mortal wounds, no.
23  Q. And were you mentally injured?
24  A. I would say, yes.
25  Q. And why would you say yes?

Exhibit __B__ of __
Page __3__ of __44__

3 (Pages 6 to 9)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 10

1    A. The amount of people that I had a hand in
2  killing had a lot to do with distress.
3    Q. And we'll get to this a little bit later, but I
4  understand you've been diagnosed with posttraumatic
5  stress disorder?
6    A. Yes.
7    Q. And is that related to your Vietnam experience?
8    A. Yes.
9    Q. And what was the nature of your discharge from
10  the Army?
11    A. Honorable.
12    Q. And do you currently have any service-connected
13  disability?
14    A. Yes.
15    Q. And what percent disability do you have?
16    A. Currently I'm 100 percent disabled.
17    Q. When were you first diagnosed as having a
18  service-related disability?
19    A. The first time was in 1998. They said that I
20  had --
21    MR. ACKER: Can you clarify as to whether or not
22  you're referring to the first onset of the diagnosis or
23  the first rating of his disability?
24    MR. DANIEL: I'm asking about the -- when he was
25  first diagnosed, not the onset of the illness. At least

Page 11

1  at this point, that's what I'm asking.
2    Q. So, yeah, when were you first given a rating by
3  the V.A. of a service-connected disability?
4    A. Oh, by the V.A.?
5    Q. Right.
6    A. I was given a rating, I think it was September
7  of '03 is when I got the decision.
8    Q. And what was that decision?
9    A. That was a 50 percent decision.
10    Q. 50 percent disability -- service-connected
11  disability?
12    A. Yes, service-connected disability.
13    Q. So that would have been after you stopped going
14  to work at UPS?
15    A. Yes.
16    Q. And in the decision from the V.A., did they
17  state when your service-connected disability started?
18    A. I don't understand the question.
19    Q. When they gave you the decision that you had the
20  50 percent service-connected disability, did they assign
21  a date?
22    A. They assign a start date for payment.
23    Q. Okay.
24    A. They don't assign a date for -- a start date of
25  PTSD.

Page 12

1    Q. And what was the start date for payment?
2    A. I believe it was May.
3    Q. May of '03?
4    A. '03.
5    Q. And do you know what -- what examinations,
6  psychiatric examinations they were looking at in order to
7  make that determination in September of '03?
8    A. They do a competent pension examination.
9    MR. ACKER: Objection. I think it's outside his
10  personal knowledge. You can ask him what evidence was
11  presented or what evidence he presented.
12    Q. Well, let me ask it a different way. Were you
13  examined by a psychiatrist or a psychologist or a V.A.
14  doctor as part of the application process for a
15  service-connected disability?
16    A. Yes.
17    Q. And when did those exams take place?
18    A. The exams started taking place in, I believe, it
19  was in March of '03, because I started my --
20    Q. And do you recall the names of the doctors that
21  examined you?
22    A. I don't understand the question, so I don't know
23  what you're really asking.
24    Q. The doctor -- you said you were examined -- they
25  started examining you in March of '03, V.A. did; is that

Page 13

1  right?
2    A. Yes.
3    Q. And my question is, do you recall the names of
4  any of the V.A. doctors that examined you?
5    A. I recall most of them, yes.
6    Q. What are their names?
7    A. I started out with Dr. Clemens and Donna Hay.
8    Q. Donna Hay?
9    A. Donna Hay. And Dr. Timmons, Dr. Elrod.
10    Q. Elrod?
11    A. Elrod. And I seen a Dr. Zozer -- Zelzer --
12  Zoer.
13    Q. How do you spell that?
14    A. Z-O --
15    Q. Starts with a Z?
16    A. Z-O something. And I -- I think it was a Dr.
17  Campbell, but I'm not sure. I think that's his last
18  name.
19    Q. And these are all doctors that are employed by
20  the V.A. here in Anchorage?
21    A. I believe Zoer and Campbell are outside
22  psychiatrists that come in for examination.
23    Q. Okay. And the other Clemens, Donna Hay, Timmons
24  and Elrod are here in Anchorage?
25    A. I believe some of them have retired and

Midnight Sun Court Reporters *** (907) 258-7100

Case No. A05-056 Civil (JWS)                                            Robert Borgen

---

Page 14

1  transferred.  Timmons is still here.  I still see --
2  currently seeing him.
3      Q.  Okay.  How often do you see him?
4      A.  Once a week.
5      Q.  For pyschotherapy?
6      A.  Yes.
7      Q.  And are you currently on any medication for your
8  condition?
9      A.  No.
10     Q.  Have you been on any medication in the past --
11 well, since 2003?
12     A.  Yes.
13     Q.  What medication?
14     A.  I'd have to get you a list, because the names, I
15 don't know them.
16     Q.  What was the medication for?
17     A.  Sleep, dreams, anxiety.
18     Q.  Depression?
19     A.  Yeah.
20     Q.  And do you currently take any medication at all?
21     A.  I take medication for my hiatal hernia, acid
22 reflux.
23     Q.  And do you know the name of that?
24     A.  No, it stats with a R, but I couldn't tell you
25 what it was.

---

Page 15

1      Q.  And how long have you been taking that?
2      A.  About a year, a little over a year.
3      Q.  And do you take any other medication?
4      A.  No.
5      Q.  And does the medication you're currently taking
6  interfere with your ability to recall events that
7  occurred in the past?
8      A.  No.  It's --
9      Q.  So if I understand correctly, you currently
10 suffer from acid reflux disease and from posttraumatic
11 stress disorder; is that correct?
12     A.  Yes.
13     Q.  And do you have any other medical condition or
14 illness?
15     A.  I've got -- I don't know what to say, but I've
16 got feet problems, yeah.
17     Q.  And what has that been diagnosed as?
18     A.  Again, with the large words, I don't know what
19 it's called, but it's basically I tore the muscles from
20 my heel to my toes on the bottom of my foot.
21     Q.  Oh, okay.  And when did that happen?
22     A.  About a year ago.
23     Q.  What were you doing that caused it?
24     A.  I don't know.
25     Q.  You don't know what caused it?

---

Page 16

1      A.  No.  And I also have a bone spur on my left toe
2  which was caused by a '96 -- or a '98 injury, I believe
3  it was, from UPS.
4      Q.  And would any of the physical injuries prevent
5  you from working?
6      A.  Yes.
7      Q.  Which one?
8      A.  The feet.
9      Q.  Okay.  And do you have any idea of when the foot
10 injury may heal or whether it will heal?
11     A.  No idea.
12     Q.  Don't know?
13     A.  No.
14     Q.  And have you been given any prognosis as to
15 whether you may recover from PTSD?
16     A.  No.
17     Q.  Well, one thing that caught my attention is that
18 you had been taking several drugs for the PTSD and now
19 you're not taking any, which indicates to me that you
20 must be showing some signs of improvement.  Am I correct?
21     A.  No.
22     Q.  And why -- why is that incorrect?
23     A.  Because it shows the signs of the drugs were not
24 working.
25     Q.  Oh, okay.  So in your view has the PTSD improved

---

Page 17

1  since you were first diagnosed?
2      A.  I don't know what you mean by "improved."
3      Q.  Do you think it's better or worse now than it
4  was in 2003?
5      A.  I imagine when you kill somebody it doesn't get
6  better; it doesn't get worse; it stays the same.
7      Q.  Okay.  And when do you feel that you first
8  started suffering symptoms of PTSD?
9      A.  It's hard for me to say.  I imagine I first
10 suffered it when I killed my first man in Vietnam.
11     Q.  Before 2003, when you started seeing these --
12 well, let me back up.
13         When did you first see a psychiatrist or a health
14 care provider for what now turns out to be PTSD?
15     A.  I believe it was in '98.
16     Q.  Okay.  And who did you see in 1998?
17     A.  I saw Dr. Clemens.
18     Q.  A V.A. doctor?
19     A.  Yes.
20     Q.  And what was the reason you went to see Dr.
21 Clemens?
22     A.  UPS had me examined by a Dr. Montooth, a
23 therapist, and he had diagnosed me with signs of PTSD.
24     Q.  And is Dr. Montooth a private physician?
25     A.  You'll have to ask UPS.

Exhibit B
Page 5 of 41

5 (Pages 14 to 17)

Case No. A05-056 Civil (JWS)                                                Robert Borgen

Page 18

1    Q. You don't know?
2    A. No. He was UPS.
3    Q. And what was the reason, if you know, that UPS
4    asked you to see Dr. Montooth?
5    A. I was falsely accused of doing something in 1998
6    and suspended for ten weeks.
7    Q. What were you accused of doing?
8    A. A threatening to lock and load and to come down
9    and harm people at UPS.
10   Q. And who was it, if you know, who made the
11   decision for you to see Dr. Montooth?
12   A. I think it was Stan Colton, but I'm not sure.
13   I'm not sure who made these decisions. I wasn't party to
14   that.
15   Q. And was Stan Colton the highest level person at
16   UPS here in Anchorage at that time?
17   A. I believe he was.
18   Q. What was his job title?
19   A. I don't know. Supervisor of some sort.
20   Q. Okay. Did he supervise you directly?
21   A. Yes.
22   Q. Now you say you were falsely accused, so is it
23   your position that you did not say that you were going to
24   lock and load on someone?
25   A. Yes.

Page 19

1    Q. What -- what do you recall about the incident
2    that led to your being referred to a physician?
3    A. I don't know. I was off that day, so I got a
4    phone call from my union that I had to call in to UPS. I
5    called in to UPS and Jay Marshall wouldn't tell me
6    anything, he just said he was sending me a letter.
7    Q. And did he send you a letter?
8    A. Yes.
9    Q. And this was the letter accusing you of locking
10   and loading or saying you were going to lock and load on
11   someone?
12   A. Yes.
13   Q. And did you grieve that letter?
14   A. Yes.
15   Q. And what was the outcome?
16   A. I was reinstated. There was no violent
17   tendencies.
18   Q. And at what level was the grievance decided in
19   your favor?
20   A. I imagine the local level.
21   Q. It didn't go all the way to arbitration?
22   A. No, it went all -- you know, to the local level.
23   Q. Okay. And how long were you off work?
24   A. Approximately ten weeks.
25   Q. Were you given back pay for those ten weeks that

Page 20

1    you were off?
2    A. I was made a deal and UPS reneged on it, yes.
3    Q. What do you mean you were made a deal?
4    A. They gave me a -- they told me that they agreed
5    my route was an hour and a half out, that they would take
6    that time off, that they would give me half of the money
7    back of the ten weeks that I lost and then they didn't.
8    Q. So was that like a settlement of the grievance?
9    A. That was supposed to have been a settlement of
10   the grievance.
11   Q. Okay. So they give you half of the back pay
12   that you thought you were owed, you would be reinstated,
13   and they would do what to your route?
14   A. They would lower my route because they agreed my
15   route was an hour and a half out of the time allowance.
16   Q. So was the agreement they would give you another
17   hour and a half to perform your route?
18   A. They would take an hour and a half away. They
19   would remove that much work.
20   Q. Reduce a number of stops?
21   A. Yes, to make it an eight-hour day or a
22   nine-hour.
23   Q. And who made that agreement on behalf of UPS?
24   A. It was Jay Marshall and Carolyn Addison and I
25   don't know who else was in the room.

Page 21

1    Q. And who represented the union in that?
2    A. John Romig.
3    Q. And was that agreement put in writing?
4    A. I do not believe it was.
5    Q. Is John Romig still with Teamsters?
6    A. I don't think so.
7    Q. Is he still in Anchorage?
8    A. I believe he would be, yeah.
9    Q. Now with regard to the PTSD, I take it that it's
10   your belief that you were suffering from PTSD while you
11   were employed by UPS?
12   A. I couldn't answer that question.
13   Q. You don't have an opinion?
14   A. Yeah, I have no idea.
15   Q. Okay. Well, I am a little confused because I
16   thought you said earlier that you thought you started
17   suffering from PTSD when you were in Vietnam.
18   A. After consulting with psychiatrists and talking
19   with them, yes, that's when I --
20   Q. Their conclusion?
21   A. The conclusion was that.
22   Q. So my question is if you first started suffering
23   from it when you were in Vietnam, did it simply not
24   reoccur until 2003 or were you suffering from it
25   continuously from the time you served, from Vietnam up

6 (Pages 18 to 21)

Case No. A05-056 Civil (JWS)                                                    Robert Borgen

Page 22

1   until the present day?
2       MR. ACKER: Objection. I don't think that's
3   within his personal knowledge and I think it's one thing
4   to ask him about if he suffered any symptoms from that
5   and another thing to ask him if he got -- I don't think
6   the diagnosis goes away, from my understanding of PTSD.
7   Are you asking him if the disease, if he no longer
8   suffers from the disease during that time period or was
9   he suffering symptoms?
10      MR. DANIEL: Symptoms.
11      A. I have no idea. I didn't know what PTSD was
12  before then.
13      Q. Okay.
14      A. Before 1998 when I was diagnosed and then when I
15  did go to continue exams, UPS refused to allow me to see
16  the doctors in January of '99.
17      Q. So you saw that doctor in '98?
18      A. Yes.
19      Q. Did you only see him once?
20      A. Her.
21      Q. Her once?
22      A. I saw her maybe twice.
23      Q. And then you didn't see a doctor again until
24  2003?
25      A. Yes.

Page 23

1       Q. For PTSD?
2       A. Yes.
3       Q. And did you ever inform any officials at UPS
4   that you had PTSD?
5       A. Yes.
6       Q. Who?
7       A. Rob Tate, who was the supervisor, the center
8   supervisor at that time.
9       Q. And what year did you inform him of that?
10      A. 1999. January 1999.
11      Q. And did you present him with any documentation,
12  doctor's notes or did you just verbally tell him that you
13  had been diagnosed with PTSD?
14      A. I told him and I told him -- I asked him if I
15  could have time off to see my psychiatrist at the V.A.
16  and he told me, "No, you'll have to do it on your own
17  time or on the weekends."
18      Q. Did you ever provide him with a doctor's
19  statement saying that you had been diagnosed with PTSD?
20      A. No.
21      Q. Do you know whether either of the doctors that
22  you saw in 1998, Dr. Montooth or Dr. Clemens, provided
23  any documentation to UPS about your PTSD?
24      A. Dr. Montooth would have, yes.
25      Q. And do you know who he provided that to?

Page 24

1       A. Not at all. I would say human resources or
2   labor relations.
3       Q. Have you ever seen what he gave them?
4       A. Yes.
5       Q. And is it just a letter or what?
6       A. It's whatever doctors give.
7       Q. Okay. And do you know whether in the letter
8   that Dr. Montooth sent, was he asking UPS to do anything
9   as a result of your diagnosis?
10      A. That letter was in 1998.
11      Q. You don't recall?
12      A. Yeah, as far as recalling what was --
13      Q. Okay. And then in January 1999, you asked Rob
14  Tate for time off to see a V.A. doctor; is that right?
15      A. Yes.
16      Q. And he said you would have to do it on your own
17  time?
18      A. Yes.
19      Q. Okay. And did you see the V.A. doctor on your
20  own time?
21      A. They're not open on what was my time.
22      Q. Because that was on weekends or something?
23      A. It was weekends and UPS wouldn't let me get off
24  work before 7:00 at night.
25      Q. Okay. So did you ever see a V.A. doctor after

Page 25

1   January of 1999 while you were still working at UPS?
2       A. I don't believe so, no.
3       Q. And other than asking Rob Tate for time off to
4   see a doctor, did you ask UPS to do anything else because
5   of your PTSD diagnosis?
6       A. No.
7       Q. And so were you currently able to perform any
8   kind of gainful employment?
9       A. No.
10      Q. Have you been able to perform any type of
11  gainful employment since February 2003 when you last
12  worked at UPS?
13      A. No.
14      Q. Have you been told by any of the psychiatrists
15  that you have seen whether you will be able to return to
16  employment at some time in the future?
17      A. No.
18      Q. So it's just uncertain at this point?
19      A. Yes.
20      Q. Let me switch gears a minute. Have you ever
21  filed a lawsuit in court before this one?
22      A. For what?
23      Q. For anything.
24      A. I don't know if it was filed in court, but I
25  think I filed one for a real estate deal, land sale.

7 (Pages 22 to 25)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 26

1    Q.  And when was that?
2    A.  2001, I believe, or could have been 2000.
3    Q.  And this had to do with a personal real estate
4  transaction?
5    A.  Yes, purchasing a home.
6    Q.  Okay.  And did the case go to court?
7    A.  No.
8    Q.  Was it settled?
9    A.  Settled at arbitration.
10    Q.  And were you represented by a lawyer?
11    A.  Yes.
12    Q.  Who was your lawyer?
13    A.  Edgren.  I believe David Edgren.
14    Q.  David Edgren?
15    A.  I believe that's his name.
16    Q.  And how was the case settled?
17    A.  I guess in my favor.
18    Q.  Did somebody pay you some money?
19    A.  Yes.
20    Q.  And who was it that had to pay you money?
21    A.  I want to say Tony's Interiors, but I'm not sure
22  if that's the -- you know, if that was the name of it.
23  Tony Lerma was his last name, Lerma.
24    Q.  And what was the reason that you sued Tony's
25  Interiors?

Page 27

1    A.  He failed to get me a certificate of occupancy
2  on a new home.
3    Q.  And did you have to give a deposition in that
4  case?
5    A.  I don't know if I did or not.
6    Q.  Okay.  All right.  Other than that lawsuit, are
7  there any others that you've ever been involved in?
8    A.  I don't believe so, no.
9    Q.  And in getting ready for this deposition today,
10  what did you do to prepare, if anything?
11    A.  I don't know what you mean.  Brush my teeth.
12    Q.  Well, no, that's not what I meant.  Did you look
13  at any documents?
14    A.  I read some documents, yes.
15    Q.  What did you look at?
16    A.  Just -- I don't know what they're called.
17    Q.  Court papers?
18    A.  I believe that's what they are.
19    Q.  Okay.  A copy of the lawsuit that you filed?
20    A.  Yes.
21    Q.  Okay.  Any other documents that you looked at?
22    A.  No.
23    Q.  Did you look at any of your medical records?
24    A.  No.
25    Q.  Did you look at any of the documents in your --

Page 28

1  the grievance that you filed with the Teamsters Union?
2    A.  No.
3    Q.  Did you look at any of the documents in your
4  Worker's Compensation class?
5    A.  No.
6    Q.  So is the only document you looked at a copy of
7  the lawsuit that you filed in this case?
8    A.  Yes.
9    Q.  And would that be this document right here,
10  which we will mark as Exhibit 1?
11    A.  I believe this is it, yes.
12       (Exhibit No. 1 marked.)
13    Q.  So you don't recall looking at anything else
14  other than Exhibit 1 --
15    A.  Yes.
16    Q.  -- before your deposition.
17       Did you consult with your lawyer?  And I don't know
18  what you and your lawyer discussed, I just want to know
19  whether you and he talked in preparation for the
20  deposition.
21    A.  I imagine, yes.
22    Q.  And have you ever been arrested for a crime?
23    A.  I don't believe so, no.
24    Q.  Never served any jail time?
25    A.  Maybe when I was younger, but I have not served

Page 29

1  any jail time in over 20 or 30 years, 20 years.
2    Q.  When you were younger, what are you referring
3  to?  Just before you were 18?
4    A.  No, probably after Vietnam.
5    Q.  And when -- what did you have to serve jail time
6  for?
7    A.  I was accused of a crime.
8    Q.  What were you accused of?
9    A.  Drug traffic, I guess.
10    Q.  And was that while you were still in the Army?
11    A.  No.
12    Q.  Was it here in Anchorage?
13    A.  Yes.
14    Q.  And do you recall what year it was?
15    A.  '76, '75.
16    Q.  And what was the specific charge?
17    A.  I don't remember what the specific charge was.
18    Q.  But were you accused of selling drugs?
19    A.  No.
20    Q.  Possession of drugs?
21    A.  Yes.
22    Q.  And what drug were you accused of possessing?
23    A.  Cocaine.
24    Q.  Anything else?
25    A.  No.

8 (Pages 26 to 29)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 30

1    Q. And were you in possession of cocaine?
2    A. No.
3    Q. And what was the outcome of the criminal charge?
4    A. Innocent, thrown out.
5    Q. Dismissed?
6    A. All charges dismissed, yeah.
7    Q. Have you ever had a drug habit?
8    A. No.
9    Q. Okay. If I'm recalling correctly, you got out
10   of the military in July of '71.
11   A. I believe discharge date was August 1st, '71.
12   Q. August '71. And did you go back to Kenai when
13   you got out of the Army?
14   A. Yes.
15   Q. And give me a run-down of what you did between
16   1971 and when you went to work for UPS and -- wasn't that
17   '85?
18   A. Yes.
19   Q. Okay. What did you do in those years?
20   A. I was a surveyor, a longshoreman and worked for
21   ART, which was UPS's other side.
22   Q. What do you mean its other side?
23   A. It was called ART up here.
24   Q. Okay.
25   A. And then switched to UPS in '85, I believe.

Page 31

1    Q. Okay. How long did you work as a surveyor?
2    A. My whole life. I guess I don't know what you
3    mean.
4    Q. I mean from '71 until when?
5    A. I stopped surveying in seventy -- I want to say
6    '77, '76, '77.
7    Q. And did you have your own business or did you
8    work for someone else?
9    A. Worked for other people.
10   Q. On contract or one -- just one company?
11   A. Different companies, yes. I worked basically
12   union.
13   Q. Union jobs?
14   A. Uh-huh.
15   Q. Through Teamsters Local?
16   A. Yes.
17   Q. And were these seasonal jobs?
18   A. Construction jobs, yes.
19   Q. Okay. And then after you stopped surveying,
20   what did you do next?
21   A. Long shore.
22   Q. Was that also a Teamsters job?
23   A. Affiliated Teamster job.
24   Q. How long did you do that?
25   A. Approximately eight years.

Page 32

1    Q. And was that still in Kenai?
2    A. No, here in town.
3    Q. In Anchorage. So what year did you move to
4    Anchorage?
5    A. 1974.
6    Q. And was that to take a job here?
7    A. To leave from here for work, yes.
8    Q. Okay. And who did you work for as a
9    longshoreman?
10   A. All the people that docked at the Port of
11   Anchorage, I imagine Josey (phonetic) Island.
12   Q. Were you -- who paid your salary?
13   A. Whoever I worked for that week.
14   Q. Oh, so it would be a different one each week?
15   A. Whatever ship came in.
16   Q. Okay. And then what was the next job you had
17   after being a longshoreman?
18   A. UPS. I went to work for UPS.
19   Q. But it was called ART initially, ART?
20   A. Yeah, ART in '78. I think it was '78 I went to
21   work for them.
22   Q. And what does "ART" stand for?
23   A. Alaska Rapid Transit.
24   Q. And what did you do for ART?
25   A. I was a delivery driver, route driver.

Page 33

1    Q. In Anchorage?
2    A. Yes.
3    Q. And then in '85 you went to work for UPS?
4    A. Yes.
5    Q. So did UPS just take over ART or did the name
6    change? What happened in '85?
7    A. Well, what happened was UPS came in and locked
8    the doors one day and refused to bring freight up here
9    and we were all unemployed one morning. And then they
10   waited 31 months and came back.
11   Q. When was it that that happened, what year?
12   A. They came back in '85, so...
13   Q. So you worked from '78 to about, what, '83, '84
14   at ART?
15   A. This was -- a lot of this was seasonal work.
16   Q. Okay. All right. When you -- when UPS came
17   back in '85, did your delivery job change significantly?
18   A. Just the route.
19   Q. Still driving the same kind of truck?
20   A. Same truck.
21   Q. Different supervisors?
22   A. Yes.
23   Q. Starting in '85?
24   A. Uh-huh.
25   Q. Okay. And '85 was the first time you officially



Case No. A05-056 Civil (JWS)                                                    Robert Borgen

Page 34

1  became a UPS employee?
2      A. Yes, '85 is when UPS called me up and asked me
3  if I would come to work for them and offered me a $2,000
4  bonus to sign up with them.
5      Q. When you were working for ART, were you
6  represented by a union?
7      A. Yes.
8      Q. Teamsters?
9      A. Teamsters.
10     Q. Okay. And then when you started back in '85 for
11 UPS, were you represented by the Teamsters Union?
12     A. Yes.
13     Q. So you were represented by the Teamsters Union
14 the entire time that you worked at UPS?
15     A. Yes.
16     Q. And when you came back in '85, your job title
17 was delivery driver?
18     A. Yeah, route driver.
19     Q. Sometimes called package car driver?
20     A. Uh-huh.
21     Q. And was that your same job title from '85 until
22 you left in 2003?
23     A. Yes.
24     Q. Did your job duties change significantly during
25 that time?

Page 36

1      A. Yes, I think there was thousand two -- I think
2  it was a thousand one, two, three, and four was the way
3  the loops went.
4      Q. And did you have all of those loops?
5      A. Yes, because I started out with the loops.
6      Q. 1001 through 1004?
7      A. Yes.
8      Q. So what -- what are the streets that surround
9  that area that you had?
10     A. In the beginning my boundaries were from the
11 Seward Highway to the mountains, from the Glenn Highway
12 to 20th Avenue or Northern Lights.
13     Q. And so your district, I take it, included both
14 commercial and residential addresses?
15     A. Yes.
16     Q. Was it mostly -- was it more commercial or
17 residential?
18     A. Varied from day to day, but, you know.
19     Q. Depending on whose package you were delivering?
20     A. Yes.
21     Q. Now you said that there was a time when the job
22 became more computerized, more automated. When did that
23 happen or when did it begin to happen?
24     A. I'm not sure of the exact date that they started
25 that.

Page 35

1      A. Yes, uh-huh.
2      Q. How did they change?
3      A. We went computerized and monitorized, I guess
4  you call it.
5      Q. Okay. But you were still driving a truck
6  delivering packages that entire time?
7      A. Yes.
8      Q. Did your route change between '85 and 2003?
9      A. Yes. Everything had changed.
10     Q. When was your route first changed?
11     A. '86, I believe it started changing.
12     Q. Okay. And how many years did you have the route
13 that you were driving when you last worked for UPS?
14     A. The full time from day one.
15     Q. So you had basically the same route?
16     A. Same route.
17     Q. From '85 to --
18     A. Until the day I left.
19     Q. -- 2003?
20     A. Yes.
21     Q. And did that route have a name?
22     A. They were given numbers and like areas. I was
23 the northeast area or the thousand loop they would call
24 it.
25     Q. The thousand loop?

Page 37

1      Q. Well, about how long after you started for UPS
2  in '85 did that happen? Like was it within a year or
3  two?
4      A. Oh, no, it was longer than that. It was after
5  we got into our new buildings.
6      Q. So late '80s?
7      A. I believe so.
8      Q. Okay. And what happened -- what do you recall
9  about that change? What was significant to you about
10 that change?
11     A. Just going computerized.
12     Q. And going computerized meant tracking packages?
13     A. I don't believe it was tracking packages at that
14 time. I think it was only addresses. They would put all
15 the addresses in your computer for your area and to
16 adjoining loops.
17     Q. Okay. And what else changed initially besides
18 tracking addresses?
19     A. Well, just mostly that part because instead of
20 just being able to write our address down, then we ended
21 up having to -- you would punch in the first three
22 letters of a street and every street with that first
23 three letters would show up on your board and you would
24 have to scroll down to find the street.
25     Q. And when you say "punch it in," you're punching

10 (Pages 34 to 37)

Case No. A05-056 Civil (JWS)                                                    Robert Borgen

Page 38

1    it into a computer?
2        A. To a computer.
3        Q. Was it a computer on your truck?
4        A. A hand-held.
5        Q. A hand-held computer?
6        A. I guess you would call it, yeah.
7        Q. Did the hand-held computer have a name?
8        A. Dyad or Diva or something like that.
9        Q. Dyad, do you know what Dyad stands for?
10       A. No.
11       Q. The last word's probably device. And how big is
12   a Dyad?
13       A. A little larger than your pads there, probably,
14   legal pads.
15       Q. Okay. So it's just --
16       A. Approximately 3 inches thick or so.
17       Q. So just a miniature computer?
18       A. Yes.
19       Q. All right. So initially you said they were
20   tracking addresses and did there come a time when UPS
21   started tracking packages, as well?
22       A. Yes.
23       Q. And do you recall about when that begun --
24   began?
25       A. No, because they were always implementing new

Page 39

1    things into this computer.
2        Q. And you said initially when you got the Dyad
3    computer, that had the addresses where you had to deliver
4    packages?
5        A. It had the street names, not the addresses.
6        Q. The street names, not the addresses?
7        A. Yes.
8        Q. Did it eventually have the addresses?
9        A. I don't believe it ever had the addresses.
10       Q. So how did you know where to go deliver
11   packages? Did you just look at the packages or did you
12   have some sort of computer screen or printout or what did
13   you look at?
14       A. You looked at the packages, the address.
15       Q. Okay. And then when you deliver a package, how
16   did you record the date and time that it had been
17   delivered?
18       A. Initially I started writing it and then we went
19   to the computers.
20       Q. And did you put that information in the Dyad
21   device?
22       A. Yes, we had to scan -- they had a 12-digit or a
23   8-digit number that you had to type in and you had to
24   type in the street address, street numbers, apartment
25   numbers, print -- have the customer sign it and then

Page 40

1    print their name if it was not legible.
2        Q. Okay. And you said that you looked at the
3    packages to see the address that it was to be delivered
4    to --
5        A. Yes.
6        Q. -- is that right? So was there any way that
7    your packages were put in your truck so that you would
8    deliver them in an orderly fashion?
9        A. They were -- eventually they came to a
10   sequential load, but in the beginning we just loaded them
11   according to area.
12       Q. So that meant there was some backtracking in
13   your deliveries?
14       A. A lot of backtracking, yes.
15       Q. But eventually that changed so that they were
16   put in a sequential way?
17       A. Yes.
18       Q. And when did that change occur?
19       A. That would have changed in the '80s or '90s.
20       Q. Okay. So as a delivery driver for UPS, your
21   job, as I understand it, was to pick up packages for your
22   area and deliver those packages in your area; is that
23   right?
24       A. And customer service.
25       Q. And what do you mean by "customer service"?

Page 41

1        A. Making sure that the customers have the proper
2    form, might pick up accounts. Anytime I saw a package
3    being shipped by another carrier, UPS wanted us to
4    approach the people and inform them about us so we had to
5    represent the company about taking in more business from
6    people. Things like that.
7        Q. And could you describe for me briefly the
8    components of your job during the day? Like first thing
9    in the morning I take it you had to load up your truck?
10       A. In the beginning, yes.
11       Q. Okay. And did that change at some point?
12       A. Yes, after a few years. In the beginning I
13   would load up to five trucks in the morning and then
14   deliver one.
15       Q. And then at some point did you stop having to
16   load the truck?
17       A. Yes. We went to a pre-load center.
18       Q. And somebody else loaded it for you?
19       A. Yes.
20       Q. And when did that happen?
21       A. In the mid-'90s, I believe.
22       Q. Okay. So in about the last seven or eight years
23   of your work at UPS, you just came in, you got in your
24   truck, it was already loaded and all you did was deliver
25   the packages and do the customer service?

11 (Pages 38 to 41)

Case No. A05-056 Civil (JWS)                                              Robert Borgen

Page 42

1    A. Well, yes, uh-huh.
2    Q. Okay. And then the latter years of your
3  employment at UPS, about how many hours did you work a
4  day?
5    A. Ten to twelve.
6    Q. Okay. Monday through Friday?
7    A. Yes.
8    Q. And were you paid overtime?
9    A. Yes.
10    Q. How was the overtime paid?
11    A. On my check.
12    Q. But I mean at what point did you start getting
13  overtime?
14    A. After eight hours.
15    Q. After eight hours in a day?
16    A. Yes.
17    Q. Now at some point in time I understand that UPS
18  started doing time studies on how long it took you to
19  deliver your packages?
20    A. No. They did one time study.
21    Q. Just one?
22    A. Yes.
23    Q. And when did that occur?
24    A. That occurred in '86, I believe it was.
25    Q. So describe to me what happened.

Page 43

1    A. On the time study?
2    Q. Yes.
3    A. The gentleman rode with me in the package car
4  for the entire day and he would count the number of
5  stops, number of steps it took me to go to and from the
6  delivery area, from the truck to the house, and how long
7  it took me at each location to make a delivery, how many
8  stop signs, how many stop lights, how many intersections
9  I had to cross.
10    Q. And so did he record an amount of time for each
11  one of those events?
12    A. I believe so.
13    Q. Okay. And do you recall who that was that rode
14  with you?
15    A. No.
16    Q. Was it somebody from the local office of UPS?
17    A. Back then we didn't have really a local office.
18  They brought in a bunch of supervisors from the states
19  and they just -- this was a bad duty assignment.
20    Q. So this was a guy from the Lower 48?
21    A. Yeah, some guy.
22    Q. Do you know if he came from Atlanta or where he
23  came from?
24    A. This would all be -- I'm assuming they were all
25  from the west coast.

Page 44

1    Q. Okay.
2    A. We were on a west coast district.
3    Q. And so then after he rode -- how many days did
4  he ride with you?
5    A. I believe three.
6    Q. Consecutive?
7    A. Yes.
8    Q. And then as a result of that, did he produce
9  some sort of report?
10    A. Yes.
11    Q. And what was the nature of the report that he
12  produced?
13    A. That my route was an hour and a half longer than
14  it should be.
15    Q. And explain what you mean by that.
16    A. That the amount of time that was allocated from
17  my route should have been longer or shorter -- I don't
18  know how to explain it. I shouldn't have been out as
19  long as what the supervisors were sending me out to work.
20    Q. At the time you did that study, about how long
21  was it taking you to do your route?
22    A. An eight-hour day would take me nine and a half
23  to ten hours.
24    Q. And as a result of his study, how long did he
25  say it should have taken?

Page 45

1    A. As a result of his study?
2    Q. Right.
3    A. It should have taken the nine and a half to ten
4  hours to do it, I believe. I don't know how that's
5  worded.
6    Q. So if I'm understanding you correctly, his study
7  indicated that the amount of time you were taking to run
8  the route was about right?
9    A. Yes.
10    Q. And did anything change as a result of his
11  study?
12    A. No.
13    Q. You just -- you continued delivering packages
14  and it continued to take you nine and a half to ten hours
15  a day to deliver them?
16    A. There was continuous parts on UPS, they
17  continually overworked, put the work on us and on me
18  to -- because they were new back in the state of Alaska
19  they didn't have anybody else to work the hours and they
20  were always telling me that they would straighten it out
21  later when they hired new help.
22    Q. Okay. So let me see if I understand this
23  correctly. Are you telling me that after this time study
24  was done, you were getting assigned more deliveries to
25  make?

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 46

1    A. Assigned, yes, I guess you would say that. The
2  area would increase with volume, packages.
3    Q. So from the time -- after the study was done,
4  you were starting to have to deliver more packages than
5  you were delivering when the time study was done; is that
6  right?
7    A. Yes, uh-huh.
8    Q. Okay. And so as a result of that, was it taking
9  you more time to run your route?
10    A. Yes.
11    Q. And what did the time increase to?
12    A. Not knowing if you -- what you mean, but I would
13  go from 10 to 14 to 16 hours. Some days I would start
14  working at 6:00 in the morning and get off at 10:00 at
15  night.
16    Q. And you said UPS was telling -- they were
17  shorthanded and they were telling you, you know, "We're
18  going to get this straightened out and we can hire more
19  people"?
20    A. Yes.
21    Q. Okay. And who told you that, if you recall?
22    A. You know, it started out with Jimmy Carr. He
23  was one of the first center supervisors up here.
24    Q. All right. And did they ever hire more drivers?
25    A. There was a constant hiring of drivers, yes.

Page 47

1    Q. And did that reduce the amount of packages you
2  had to deliver?
3    A. No.
4    Q. Why not?
5    A. You would have to ask them. I don't know why
6  not.
7    Q. Do you have any opinion as to why that didn't
8  reduce the level of -- or the number of packages that you
9  had to deliver?
10    A. Well, mostly because the freight kept coming in.
11  People kept ordering more merchandise. The volume
12  kept --
13    Q. So the volume kept increasing and they weren't
14  hiring enough people to keep up with the volume; is that
15  what you're saying?
16    A. Well, yeah.
17    Q. Okay. And in terms of how this affected you,
18  your testimony is that they were never able to reduce
19  your workload to where you could do it in nine and a
20  half, ten hours a day?
21    MR. ACKER: Objection. He didn't know what
22  their ability was to do that.
23    Q. Well, did your work -- did you feel that your
24  workload ever dropped down to the level where you could
25  do it in nine and a half to ten hours a day?

Page 48

1    A. No.
2    Q. So from 1987 to 2003 when you last worked at
3  UPS, did you routinely work anywhere from 10 to 16 hours
4  a day?
5    A. Yes, except on days that they would ask me if I
6  wanted a code five or some form of asking if I wanted to
7  do a code five.
8    Q. What's a code five?
9    A. Paid for the hours worked.
10    Q. I don't understand. What does that mean?
11    A. It's usually -- it was first set up to design
12  for anything under four hours. If there was four hours
13  or less of work, you got paid for the hours worked and
14  then UPS up here started letting drivers, if they had six
15  hours' worth of work, let them go out and come back with
16  six hours rather than putting more work on the truck.
17  They would have them make an agreement that they would
18  only charge them the six hours' worth of work, rather
19  than the Union contract of being paid for the whole day.
20    Q. I'm confused. You were working during this
21  period 10 to 16 hours a day?
22    A. Yes.
23    Q. Unless UPS did what?
24    A. Well, unless my -- unless they took some
25  packages off of my area and gave them to other drivers,

Page 49

1  other areas to fill up their eight-hour days. Then they
2  would ask me if I wanted a code five; otherwise they
3  would have to give me somebody else's work.
4    Q. So a code five was getting somebody else's work?
5    A. No, was getting paid for just the hours you were
6  out on the road working.
7    Q. But didn't you always get paid for the hours you
8  were out on the road working?
9    A. The union contract didn't have a -- a split
10  workday clause. You either got paid for the whole day --
11  whether you worked the whole day or not, they had to pay
12  you for the eight hours unless you agreed not to.
13    Q. I'm still not understanding this. Did you get
14  paid for all the hours that you worked?
15    A. Yes.
16    Q. So what did the code five have to do with the
17  number of hours you got paid?
18    A. The code five would be that if I went in and
19  only had four hours' or five hours' worth of work on my
20  truck and I didn't agree with it, I could have delivered
21  them in five hours, UPS would have to pay me for eight.
22    Q. Oh, okay. Even though it only took you five
23  hours to deliver them?
24    A. Right. So a code five would allow them to leave
25  the truck partially emptied, so that the driver, if he

13 (Pages 46 to 49)

Case No. A05-056 Civil (JWS)                                Robert Borgen

Page 50

1  wanted to get off early, he could do it. If not, then,
2  of course, UPS would always threaten you and then give
3  you more work if you didn't take their code five.
4      Q. And taking their code five meant working less
5  than five hours or getting paid for five hours?
6      A. No. It meant working whatever hours you worked
7  you got paid for, be it three, two, one, six. There was
8  never a set amount of hours of what the code five was.
9      Q. Okay. Well, I'll come back to this. I don't
10 think I understand it.
11     When the time study was done in 1987, was it done
12 for all UPS drivers here?
13     A. Yes.
14     Q. And were there other drivers in the same
15 position you were in that the time study showed that they
16 should be able to do their route in nine and a half to
17 ten hours, but, in fact, it was taking them much longer?
18     A. I didn't see anybody else's time study.
19     Q. So you don't know?
20     A. No.
21     Q. Do you recall any of the other drivers that you
22 worked with complaining that it was taking them too long
23 to do their route?
24     A. Yes.
25     Q. Who complained about that?

Page 51

1      A. Most of the drivers.
2      Q. Most of the drivers?
3      A. Yes.
4      Q. And based on what you observed, did it appear
5  that most of the drivers were working about the same
6  amount of time that you were?
7      A. I don't know how to answer that.
8      Q. Well, when you came to work in the morning, I
9  assume there were other drivers coming to work at the
10 same time; is that right?
11     A. There were other drivers already working in
12 there before I got to work.
13     Q. And were there also some that came to work at
14 the same time you did?
15     A. Yes.
16     Q. And then when you finished your route at night,
17 were there other drivers who were also returning at the
18 same time?
19     A. No. Well, I don't know how to answer your
20 question. All the drivers had a starting time of 8:15 or
21 8:00 or whatever it was. You know, there were certain
22 drivers that would come in to work off the clock so they
23 could get their time done -- their route done on time in
24 the eight-hour or nine-hour span.
25     Q. So when you came in at night, let's say on one

Page 52

1  of these days where you worked 12 or 14 hours, did you
2  observe any other drivers returning to the station at the
3  same time?
4      A. There would be either drivers leaving when I
5  pulled in or coming -- being in the building, yes. We
6  all came back at different times.
7      Q. Okay. But some of them were coming back about
8  the same time as you were?
9      A. Some same and later.
10     Q. Okay. So you weren't the only one that it was
11 taking 10 to 12 hours to complete the route?
12         MR. ACKER: Objection. Beyond his personal
13 knowledge.
14     Q. Can you answer that?
15     A. Well, the other drivers that were coming in,
16 some of them were late starters, so they were getting
17 eight or nine hours.
18     Q. Were there other drivers that were coming in
19 that started -- were there other drivers coming in at the
20 same time you were who started either at the same time
21 you did or earlier?
22     A. That were coming in?
23     Q. Yes.
24     A. Very few, if I remember anybody that came and
25 started.

Page 53

1      Q. So was it your impression that you were working
2  more hours than any other UPS driver here in Anchorage?
3      A. I believe so, yes.
4      Q. And did that pattern continue during the entire
5  time you worked at UPS?
6      A. Yes.
7      Q. And why do you think it was taking you longer to
8  deliver your route than what it was taking other drivers
9  to do?
10     A. Because of the job, that's the way the job was
11 done. I don't know, the roads, the different
12 circumstances out there. I have no idea what you mean by
13 that question.
14     Q. Well, I mean, do you think that it took you
15 longer to do your route because you had more packages,
16 because you had a larger area, because of both of those
17 things or some other reason?
18     A. All of the above, I imagine.
19     Q. But do you have an opinion one way or the other
20 as to why it was taking you longer?
21     A. It took me longer than the other gentlemen, some
22 of the other drivers, because they would come in and give
23 up to 45 minutes or better free time, pre-load their
24 truck, with the guy that was loading the truck, take off
25 any misdelivered packages. The other drivers were given

14 (Pages 50 to 53)

Case No. A05-056 Civil (JWS)                                           Robert Borgen

Page 54

1  red label compensations, they were allowed to take off
2  anything that was beyond a certain point where I wasn't.
3     If they were overworked, they were allowed to remove
4  certain things and I wasn't. They got to -- some of the
5  drivers got to go in and align their stops in
6  stop-for-stop, where I was not allowed to come in and
7  pre-examine my truck or anything.
8     Q. Okay.
9     MR. ACKER: Take a break.
10    MR. DANIEL: Do you want to take a break?
11    (Recess taken)
12    Q. (By Mr. Daniel) Following up on something that
13 you said before we stopped, you said that your route
14 stayed the same from about '85 until you left in 2003?
15    A. Yes.
16    Q. Didn't the boundaries of your route shrink
17 during that time period?
18    A. My boundaries never shrank. No, my loop has
19 always been the thousand loop. The boundaries never
20 shrank. The area I had to travel, as far as delivering
21 packages, came down a little bit, yes.
22    Q. Okay.
23    A. But not in mileage.
24    Q. And the time study was done on your route in
25 1986 or '87; did you think it was accurate?

Page 55

1     A. Did I think it was accurate?
2     Q. Yes.
3     A. I had nothing to compare by so I don't know.
4  I'm assuming it was accurate.
5     MR. DANIEL: If we could mark that as Exhibit 2.
6     (Exhibit No. 2 marked.)
7     Q. I've handed you what's been marked for
8  identification as Exhibit 2. It's a document entitled,
9  "Package Driver Methods Checklist" and this one is dated
10 October 15, 2002. So could you tell me what this is?
11    A. Could I tell you what -- this is my methods
12 checklist.
13    Q. Right. What is a methods checklist?
14    A. It's just where they come out and see how you
15 perform your job.
16    Q. Somebody rides with you?
17    A. Yes.
18    Q. Is it a supervisor?
19    A. Yes.
20    Q. So on this one it says, "Observer Jeff Baxter."
21 Was he one of the supervisors?
22    A. Yes.
23    Q. Was he your supervisor?
24    A. I believe at that -- at that time it's hard to
25 say.

Page 56

1     Q. Okay. Well, let me ask you this. Is the
2  observer sometimes a supervisor that doesn't supervise
3  you?
4     A. The observer is usually a supervisor that works
5  for UPS in the package center.
6     Q. But it might be different supervisors who do
7  the -- who would be the observer?
8     A. Well, you got to understand UPS has had a bad
9  problem with their supervisors; they kept losing them,
10 fire them, quitting, and so I had so many. Jeff would
11 have been a supervisor for the center and he would have
12 just either been mine, an on-belt or an on-car
13 supervisor.
14    Q. Okay. Did you have a particular supervisor that
15 you reported to at any given time?
16    A. From when?
17    Q. Like if we looked at October 15, 2002, were you
18 assigned a specific supervisor at that time?
19    A. That's what I'm saying. October 15, 2002, I
20 don't know who was my particular supervisor at that time.
21    Q. But you did have a particular supervisor?
22    A. Yes, at that time I think I must -- I had about
23 three different ones running through there.
24    Q. You just don't recall who it was at this
25 particular point in time?

Page 57

1     A. Well, it was Rob Hughes at that time, Jeff
2  Baxter, Rob Tate supervised me and I think Doug Berry
3  supervised me through that period, too, in 19- -- or
4  2002, but I'm not sure.
5     Q. All right. So if I'm understanding this
6  correctly in this particular case, Jeff Baxter would have
7  ridden around with you on October 15, 2002?
8     A. Right.
9     Q. And observed you delivering your packages -- the
10 packages on your route?
11    A. Yes.
12    Q. And then these stops that are listed here are
13 all the places where you stopped. And I just noticed
14 mine is out of order. It looks like the --
15    A. What do you mean by out of order?
16    Q. Well, it starts with stop 41.
17    A. Right, it goes to 42.
18    Q. And actually at the third page it's stop 1, so
19 the third page is actually the first. So whose
20 handwriting is this for each stop?
21    A. It looks like Jeff's, I imagine.
22    Q. So he wrote down the address where you had to
23 make your deliveries?
24    A. Yes.
25    Q. And then over on the right-hand column where it

15 (Pages 54 to 57)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 58

1    has notes, this seems to indicate the number of packages
2    that you delivered at that address?
3        A. Yes.
4        Q. So like at the first address, which is at
5    Costco, you delivered 23 packages?
6        A. Yes.
7        Q. But then in many of these other addresses, you
8    only delivered one packages -- one package?
9        A. Right.
10       Q. And then there's some notes in the middle, like
11   under stop number 6, there's an X in column 10, "One look
12   habit." What -- what does that refer to?
13       A. That refers to looking at your next package.
14       Q. And so had you done something wrong there or
15   what is he saying?
16       A. I had to look at it twice to memorize the
17   address so I knew where to go.
18       Q. Oh, okay. And then on stop 7, there's a
19   notation under Item 19 that says "IMS." What does that
20   mean?
21       A. I don't know. You'll have to ask him.
22       Q. You don't know what that refers to?
23       A. I don't know what IMS is, no. It says, "key
24   ready," so that probably has to do something with my key
25   not being ready in my hand

Page 59

1        Q. And what was your understanding of the purpose
2    of a -- one of the -- is this called a ride-along?
3        A. Yes, this would be one of the ride-alongs.
4        Q. And what was your understanding of the purpose
5    of a ride-along?
6        A. My understanding of the ride-alongs with me was
7    to help me improve.
8        Q. Okay. And did -- you've had supervisors have
9    ride-alongs with other drivers other than you?
10       A. Pardon me?
11       Q. Did other drivers have ride-alongs performed by
12   a supervisor?
13       A. I imagine so, yes.
14       Q. And do you recall on this particular occasion
15   why Jeff Baxter was riding along with you? Were you told
16   why he was riding along with you?
17       A. On this particular occasion, no, I don't. No,
18   not unless he had mentioned that it was just to improve
19   my methods. I think right through here Jeff was a fairly
20   new supervisor at this time, too.
21           (Exhibit No. 3 marked.)
22       Q. I'm handing you Exhibit 3, which is a document
23   entitled, "Package Driver Space and Visibility Ride."
24   What is your understanding of a Package Driver Space and
25   Visibility Ride?

Page 60

1        A. Making sure you know your driving methods.
2        Q. So how does it differ from a Package Driver
3    Methods Checklist ride?
4        A. This has to do with the vehicle and how you
5    handle the vehicle. This has to do with the packages and
6    how you handle the packages.
7        Q. Oh, okay. And on the Package Driver Space and
8    Visibility Ride, you also had a supervisor who was the
9    observer?
10       A. This one?
11       Q. No.
12       A. This one?
13       Q. Exhibit 3, this one.
14       A. You know, if there was one -- if -- I don't know
15   who you got. I think they got Dale up here?
16       Q. Uh-huh.
17       A. On October 4, Dale might have ridden with me
18   once. I don't know.
19       Q. That's Dale -- what's his last name?
20       A. I don't know what Dale's last name is. I do
21   know it, but I can't think of it.
22       Q. I can't read it. It looks like Cedar, but I'm
23   not sure if that's right.
24       A. Yeah.
25       Q. Okay. So on Exhibit 3, the Package Driver Space

Page 61

1    and Visibility Ride, the supervisor is riding around with
2    you to observe your driving methods; is that right?
3        A. Uh-huh.
4        Q. To ensure that you're driving safely?
5        A. Yes.
6        Q. And so it looks like on this report, which is
7    dated 2/26/03, everything seems to be in order. Is there
8    any indication on here that you're driving incorrectly?
9        A. Nothing.
10       Q. And is 2/26/03, is that the last day that you
11   actually drove for UPS?
12       A. No, I think I drove 2/27.
13       Q. 2/27 was the last day. Okay. And did all of
14   the UPS drivers, as far as you know, have to submit to
15   package driver space and visibility rides?
16       A. I imagine.
17       Q. If you would look at Exhibit 1, which is the
18   complaint. Have you seen this document before?
19       A. Yes.
20       Q. This is the one you looked at before the
21   deposition. Did you get a chance to review the complaint
22   before it was filed in court?
23       A. Yes.
24       Q. And do you remember if you made any changes to
25   the complaint before it was filed in court?

16 (Pages 58 to 61)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 62

1   A. I would have to see it.
2   Q. So you don't remember sitting here whether or
3   not you made any changes to it before it was filed?
4   A. Not without refreshing my memory, no. I'm
5   sorry.
6   Q. All right. If you will turn to the second page,
7   paragraph eight. You state in paragraph eight that
8   "After working at UPS for over three years, Mr. Borgen
9   was told by his supervisors or Jay Marshall and Tom
10  Leonard in 1988 that he was too old for the job and that
11  they would make sure that Mr. Borgen was fired or
12  harassed him into resignation." Is that an accurate
13  statement?
14  A. To an extent, yes.
15  Q. To what extent is it not accurate?
16  A. They told me that they were going to -- that
17  there was five of them and only one of me, that they were
18  going to get me.
19  Q. Being five supervisors?
20  A. Yes.
21  Q. Okay. And did Jay Marshall and Tom Leonard tell
22  you that you were too old for the job?
23  A. Tom Leonard, yes; Jay Marshall was in the room.
24  Q. Okay. And Tom Leonard was a supervisor?
25  A. Yes.

Page 63

1   Q. And do you know how old Mr. Leonard was at that
2   time?
3   A. No.
4   Q. Do you think he was older than you or younger?
5   A. I have no idea.
6   Q. In 1988, you would have been how old?
7   A. 47.
8   Q. 37?
9   A. 37.
10  Q. 37. And did Mr. Leonard say why he thought you
11  were too old for the job?
12  A. No.
13  Q. At the time this -- in 1988, do you know
14  approximately how many drivers there were, UPS drivers
15  there were in Anchorage?
16  A. Not for sure. About fifteen.
17  Q. Fifteen or fifty?
18  A. Fifteen. Maybe a few more, maybe a few less.
19  Q. Okay. Were there any drivers that were older
20  than you?
21  A. Yes.
22  Q. How many?
23  A. Maybe three, two.
24  Q. Were there any the same age as you?
25  A. A couple, yes.

Page 64

1   Q. And the rest were younger?
2   A. Yes.
3   Q. And did Mr. Leonard explain to you why he
4   thought you were too old for the job?
5   A. No.
6   Q. Had something happened right before that, before
7   he made that statement, that you felt caused him to say
8   that?
9   A. I don't know. A few incidents had occurred.
10  Q. What incidents?
11  A. I saw supervisors exchanging drugs at the
12  warehouse and I brought it to the supervisors'
13  attentions, two other supervisors' attention.
14  Q. So did you believe that Tom Leonard made this
15  comment to you about being too old because you had
16  reported that some of the supervisors were exchanging
17  drugs?
18  A. Yes, and other misconduct by the supervisors
19  that were being done there.
20  Q. So your perception was that Tom Leonard was
21  retaliating against you because you had reported
22  misconduct by supervisors?
23  A. I don't know why he retaliated against me.
24  Q. But you felt it was retaliation against you; is
25  that right?

Page 65

1   A. I felt it was because of my age he didn't like
2   me.
3   Q. He didn't like you. What was your -- what is
4   your opinion as to why he didn't like you?
5   A. I have no idea. I've never met the man. I only
6   worked for him for the short time he was here.
7   Q. Okay. And the misconduct that you reported by
8   supervisor was -- supervisors was exchanging drugs?
9   A. Yes.
10  Q. And who did you see exchanging drugs?
11  A. You want names?
12  Q. Yes.
13  A. Well, I saw Jimmy Carr.
14  Q. Anyone else?
15  A. He was the only one I saw exchanging.
16  Q. Okay. And when you say "exchanging," you mean
17  giving drugs to someone else?
18  A. He was giving it. I saw the hands going and
19  giving, yes. There was -- UPS had a bad habit up here.
20  Q. And who was he giving the drugs to?
21  A. I have no idea who it was.
22  Q. Was it another UPS employee?
23  A. I don't know. I was loading trucks when I saw
24  it.
25  Q. And what type of drugs were they?

17 (Pages 62 to 65)

Case No. A05-056 Civil (JWS)                                          Robert Borgen

Page 66

1    A.  I don't -- I'm not sure what kind of drugs.
2    Q.  Well, how did you know there was drugs then?
3    A.  There was drugs running rampant through the
4  building whenever I would report it.
5    Q.  Well, when you saw Jimmy Carr exchanging drugs,
6  did you see this on one occasion or more than one
7  occasion?
8    A.  On one occasion.
9    Q.  One occasion.  And what exactly did you see?
10    A.  I saw a baggy being handed over to him and back.
11    Q.  A baggy?
12    A.  Yes.
13    Q.  Like a plastic bag?
14    A.  Like a plastic baggy with some white stuff in
15  it.
16    Q.  Okay.  And how do you know it was drugs in the
17  baggy?
18    A.  I don't know.  I imagine I could tell you if I
19  knew it was drugs in the baggy or not, I just know what
20  was going on at UPS at the time.
21    Q.  So you thought drugs were rampant in the
22  building and so you saw this bag with something white in
23  it and based on that you assumed it was drugs?
24    A.  Yes.
25    Q.  And did you ever confront Jimmy Carr with what

Page 67

1  you saw?
2    A.  No.  I think I told my -- at that time I told
3  the immediate supervisor.
4    Q.  And who was that?
5    A.  I'm not sure which one that was, if it was Mike
6  Stevens, because I had mentioned it to a few -- I had
7  mentioned about the drugs to Pete Morrow and everybody
8  else.
9    Q.  You told Mike Stevens and Pete Morrow; is that
10  right?
11    A.  Yes.
12    Q.  And did either Mike Stevens or Pete Morrow do
13  anything in response to your report, to your knowledge?
14    A.  No.  Pete Morrow made only one comment to me;
15  that the new supervisors was coming up here and she was
16  smuggling in 40 pounds of crack.
17    Q.  Pete Morrow said the new supervisor was
18  smuggling 40 pounds of crack.  And who was the new
19  supervisor?
20    A.  That would have been Carol Addison coming in.
21    Q.  And did he say how he knew that?
22    A.  No.  Pete was -- when he first came here, he was
23  married and then when I mentioned the drugs, he got a
24  divorce and ended up marrying the driver that he was
25  seeing under the table.

Page 68

1    Q.  And then did anything happen to you that you
2  felt was because of your report of drug possession by
3  Jimmy Carr?
4    A.  I think that is why they never lowered my route
5  down from the beginning.
6    Q.  Okay.  Anything else happen to you?
7    A.  Just the constant harassment and ride-alongs.
8    Q.  And when did Tom Leonard leave UPS here?
9    A.  I couldn't tell you when Tom Leonard left.
10    Q.  But he was not there when you left in 2003?
11    A.  No.  He had left a long time before that.  Stan
12  Colton had taken over, I believe, after him.
13    Q.  And other than Tom Leonard, did anyone else ever
14  tell you that you were too old for the job?
15    A.  Pete Morrow mentioned it one time.
16    Q.  When was that?
17    A.  About the same time frame, period, back in...
18    Q.  And what was his position at that time?
19    A.  I think he was an on-car supervisor at that
20  time, too, but he could have been higher up.
21    Q.  And did Pete Morrow explain why he thought you
22  were too old for the job?
23    A.  He just said it was a young man's game and
24  that...
25    Q.  And do you know how old Pete Morrow was at the

Page 69

1  time?
2    A.  No.  He was a lot younger than me.
3    Q.  And did Pete Morrow ever take any action against
4  you, any negative action against you?
5    A.  He tried to write a letter, I believe, in my
6  file one time.
7    Q.  When was that?
8    A.  '98.
9    Q.  And a letter about what?
10    A.  About me, I guess.  I don't know.
11    Q.  Well, did the letter ever get in your file?
12    A.  Yes.
13    Q.  And what was the -- was it a warning letter or
14  what was it?
15    A.  I do -- it was not a warning letter.  It was a
16  statement letter.
17    Q.  A statement about what?
18    A.  About my violent tendencies.
19    Q.  Okay.  Did this have to do with the lock and
20  load incident?
21    A.  I believe it did.
22    Q.  And other than that, did Pete Morrow ever take
23  any negative action toward you?
24    A.  I don't know what you mean by "negative action."
25  You know, by not taking any stops off of my route, I

18 (Pages 66 to 69)

Case No. A05-056 Civil (JWS)                                                     Robert Borgen

Page 70

1  would say, yes, he did.
2      Q. Okay. And then in paragraph nine of your
3  complaint, you say, "Early instances of harassment
4  include suspension from work for Mr. Borgen allegedly
5  threatening to take a gun into the workplace and, quote,
6  'lock and load,' unquote. This allegation made by John
7  Romig was completely erroneous and unfounded. Mr. Borgen
8  was cleared of this allegation when he attended
9  psychological counseling." So was it -- was it John
10 Romig who made the allegation or just reported the
11 allegation?
12     A. He, I guess, reported it or made the allegation.
13 I don't know how you say it. He called UPS up.
14     Q. And who was it that you were accused of going
15 to, that you were going to lock and load on?
16     A. There was no name.
17     Q. Okay. And when you say that you were "cleared
18 of this allegation when he attended psychological
19 counseling," did you have to attend counseling as a
20 result of this allegation?
21     A. No. I had to see the therapist, Montooth.
22     Q. Did you have to go to anger management
23 counseling?
24     A. No.
25     Q. Did you ever have to go to anger management

Page 71

1  counseling?
2      A. No.
3      Q. And did you see Montooth just one time?
4      A. Maybe two or three. I'm not sure. It could
5  have been just two sessions.
6      Q. And -- so one thing I'm a little confused about
7  is, was this charge dismissed because you agreed to go to
8  counseling?
9      A. No, it was dismissed because it was unfounded.
10     Q. Okay. In paragraph nine you say that, "Mr. Doug
11 Berry, UPS supervisor, has also written up Mr. Borgen for
12 wearing support suspenders on the job because it was not
13 a part of the normal UPS uniform. Mr. Borgen provided a
14 doctor's note explaining that he needed to wear
15 suspenders for support, but management continued to
16 deride him and write him up for uniform violations.
17 Mr. Borgen was told that the suspenders did not fit the
18 image of a young UPS driver and he was continually
19 ridiculed and written up for alleged uniform violations
20 even after he violated the doctor's note proving his
21 disability due to a hernia." So when did this happen?
22     A. The hernia?
23     Q. No, the incident where you got written up for
24 wearing suspenders.
25     A. In July, I believe it was the summer of '98, is

Page 72

1  when Doug Berry confronted me and told me that I didn't
2  fit his image of the UPS driver. The suspenders weren't
3  part of my uniform code. He was going to make it his job
4  to get me; that he was going to have me out of the
5  suspenders. And I told him I had a doctor's excuse and
6  showed him it and he didn't care.
7      Q. Did you give him a doctor's excuse?
8      A. Yes. A doctor's excuse has been in my file
9  since February of '86 and I carried one on me at that
10 time.
11     Q. And what did the doctor's excuse say?
12     A. I didn't have to wear -- I wasn't supposed to be
13 wearing restricted garments. I could wear suspenders.
14     Q. Why?
15     A. Because of my hiatal hernia.
16     Q. Do you recall what doctor wrote that note?
17     A. Dr. Christensen.
18     Q. Do you still see Dr. Christensen?
19     A. No.
20     Q. When did you stop seeing him?
21     A. 2003.
22     Q. Why?
23     A. I go to the V.A.
24     Q. Okay. And did you continue to wear suspenders
25 from 1998 until the time you stopped working at UPS?

Page 73

1      A. Yes.
2      Q. And were you ever disciplined in any way for
3  wearing suspenders?
4      A. Harassed.
5      Q. Harassed by -- who else other than Doug Berry?
6      A. Jay Marshall, Rob Tate, most all of the
7  supervisors.
8      Q. What did Jay Marshall do to harass you because
9  of --
10     A. They required me to wear my winter vest all
11 summer long to cover the suspenders up.
12     Q. What year was that?
13     A. It started out long, you know, early '90s on.
14     Q. On until when?
15     A. Until 2003.
16     Q. Well, Jay Marshall wasn't there in 2003, was he?
17     A. I'm not saying Jay Marshall continued on until
18 2003. You asked me how long the harassment continued and
19 the other supervisors.
20     Q. Oh, okay. When did Jay Marshall leave?
21     A. I have no idea.
22     Q. Was it before 2003?
23     A. I don't think so. I thought he was still there.
24     Q. So either Jay Marshall or some other supervisor
25 required you to wear a vest over your suspenders even in

19 (Pages 70 to 73)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 74

1  the summer months?
2      A. Yes.
3      Q. And that continued up until 2003?
4      A. Uh-huh.
5      Q. And do you recall what other supervisors besides
6  Jay Marshall required you to do that?
7      A. Rob Tate was the center supervisor at the last
8  of it.
9      Q. Did you ever file a grievance with the union
10 over that?
11     A. I had mentioned it to the union and went to the
12 first step. The shop steward talked with the company and
13 they were supposed to back off and leave me alone.
14     Q. Did they?
15     A. For short periods of time.
16     Q. And when did you talk with the shop steward?
17     A. The last time was in July of '98 when Doug Berry
18 told me that he was going to make it his job to get me
19 and get rid of my suspenders
20     Q. Okay. So you went to the shop steward in July
21 of '98, you complained about being required to wear
22 something over your suspenders?
23     A. Right, and the fact that they were harassing me
24 again about my suspenders.
25     Q. Okay. And so they backed off for a while and

Page 75

1  then they started requiring you to wear your vest again?
2      A. Yes. I just -- I kept wearing my vest to
3  ease -- so that the pain wasn't there, so I didn't have
4  the harassment.
5      Q. Well, did -- did you get harassed again after
6  July of '98 about wearing -- not wearing a vest over your
7  suspenders?
8      A. No, I kept wearing my vest, so I wouldn't get
9  harassed.
10     Q. Well, did you ever gets harassed again after
11 July of '98?
12     A. Did I ever get, after July of '98?
13     Q. Right.
14     A. For what?
15     Q. For wearing suspenders.
16     A. I just said I kept my vest on so I wouldn't get
17 harassed.
18     Q. Okay. So if I'm understanding you, you didn't
19 get harassed for wearing suspenders after July of '98; is
20 that correct?
21     A. I don't believe I was harassed again,
22 particularly for the suspenders, no.
23     Q. All right. And then in paragraph ten of your
24 complaint, you say, "In 1999, UPS suspended Mr. Borgen
25 from work when a child hit Mr. Borgen's truck with a snow

Page 76

1  sled while Mr. Borgen was stopped at a stoplight."
2      Back up a minute before we get into that. Going
3  back to the suspenders. The doctor wanted you to wear
4  suspenders because you had a hiatal hernia?
5      A. Yes.
6      Q. And that causes acid reflux?
7      A. Yes.
8      Q. Okay. And did you understand why wearing
9  suspenders instead of a belt helped that medical
10 condition?
11     A. Yes.
12     Q. Why?
13     A. Because it didn't hold my stomach in and so the
14 hiatal hernia could relax down.
15     Q. Okay. And during this time period in '98, did
16 you ride a motorcycle to work?
17     A. Yes. Uh-huh.
18     Q. And when you ride a motorcycle, did you wear
19 chaps?
20     A. Yes.
21     Q. And aren't the chaps connected around your waist
22 with a belt?
23     A. With a buckle, you mean?
24     Q. Well, is there something that goes around your
25 waist that keeps the chaps from falling off?

Page 77

1      A. A piece of string.
2      Q. Around your waist?
3      A. Well, yes, it's held with a string in the back
4  and a buckle in the front. There's not a belt that goes
5  all the way around, if that's what you're asking.
6      Q. But there is something that goes all the way
7  around your waist to hold those chaps in place, right?
8      A. There's two pieces of leather tied together in
9  the back with a string and hooked together with a buckle
10 in the front. There is nothing that goes all the way
11 around.
12     Q. And did wearing -- did wearing the chaps with
13 the buckle in the front make your hiatal hernia worse?
14     A. It wasn't on tight. Chaps aren't put on --
15 aren't put on like a belt.
16     Q. And with regard to the hiatal hernia, how did
17 that affect you -- physically, how did it affect you?
18     A. I have vomit in my throat from my contents of my
19 stomach being forced up into the throat and I would have
20 to clear my throat and loosen the belt when I first
21 started wearing it and that's when I went to get the
22 suspenders.
23     Q. How often did that happen?
24     A. Daily.
25     Q. And did that continue up until the present time?

20 (Pages 74 to 77)

Case No. A05-056 Civil (JWS)                                              Robert Borgen

---

Page 78

1    A. Up until the present time I still have.
2    Q. And how often does that happen?
3    A. Refluxing?
4    Q. Right.
5    A. It happens daily.
6    Q. And does it happen at any particular time or
7  just unexpected times?
8    A. Yes.
9    Q. Unexpected times?
10   A. Unexpected times, daily.
11   Q. Okay. Does that problem -- does that problem --
12  did that problem interfere with your ability to work at
13  UPS?
14   A. No.
15   Q. Does the problem -- has the problem ever
16  interfered with your ability to sleep?
17   A. Yes.
18   Q. How?
19   A. If I don't sleep at an angle, reflux goes into
20  my lungs.
21   Q. Okay. So you sleep at an angle?
22   A. Yes.
23   Q. If you do that, you're able to sleep okay?
24   A. Yes.
25   Q. Does it interfere with your ability to walk?

---

Page 79

1    A. No, not unless I stop to (witness gesturing).
2    Q. Okay. Going to paragraph ten. It says, "In
3  1999, UPS suspended Mr. Borgen from work when a child hit
4  Mr. Borgen's truck with a snow sled while Mr. Borgen was
5  stopped at a stoplight. This was Mr. Borgen's first
6  accident in 16 years of service. The accident was
7  clearly not Mr. Borgen's fault, yet he was suspended."
8  Is that accurate what I just read?
9    A. No, it wasn't at a stoplight, but, yeah.
10   Q. But a child did slide into your truck?
11   A. Yes.
12   Q. And you were given a -- you were suspended?
13   A. Yes.
14   Q. But were you ultimately given a -- a warning as
15  a result of that accident?
16   A. No.
17   Q. Because you were cleared once it was
18  investigated?
19   A. I was cleared before it was investigated.
20   Q. Okay. So were you -- how long were you
21  suspended?
22   A. Ten days.
23   Q. And were you compensated for those ten days when
24  you were cleared for the accident?
25   A. No.

---

Page 80

1    Q. So you lost ten days of pay?
2    A. No.
3    Q. Explain.
4    A. I was compensated after I threatened to sue the
5  kid and his parents for my lost wages.
6    Q. Compensated by the parents?
7    A. By UPS.
8    Q. By UPS?
9    A. That's when they reinstated me when I was going
10  to sue the parents.
11   Q. So you got reinstated and you got ten days of
12  back pay?
13   A. Yes.
14   Q. And there was no warning notice or anything
15  like -- any disciplinary notice put in your file as a
16  result of this incident?
17   A. No.
18   Q. Okay. And who made the decision to suspend you
19  from work?
20   A. Rob Tate, I believe.
21   Q. Okay. And did you think that Rob Tate did that
22  because of your age?
23   A. Yes and no. I don't know.
24   Q. Do you think that Rob Tate did that because of
25  your hiatal hernia?

---

Page 81

1    A. No.
2    Q. Or any other disability?
3    A. I don't believe so.
4    Q. Do you think that Rob Tate suspended you because
5  of your race?
6    A. I have no idea on that.
7    Q. What race is Mr. Tate?
8    A. I have no idea.
9    Q. Well, you've seen him before, haven't you?
10   A. Yeah.
11   Q. Is he white?
12   A. Oh, what color is he?
13   Q. Yes.
14   A. Yes, he's a white man.
15   Q. In paragraph eleven, you state that,
16  "Mr. Borgen's work-related stress stems not only from the
17  above events, but also recent age discrimination and
18  harassment occurring just prior to his constructive
19  discharge on February 27, 2003. Mr. Borgen's normal
20  route was over one and one-half hours too long. The only
21  two drivers able to complete the route in the allotted
22  time are forced to forego lunch and other break time and
23  to come into work early and leave late in order to get
24  the paperwork done. All other drivers that drive during
25  normal union work hours on Mr. Borgen's route cannot

---

21 (Pages 78 to 81)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

**Page 82**

1  complete the route on time and were frequently over one
2  and one-half hours out on a routine basis.  The route
3  simply cannot be completed on time if a driver follows
4  normal union rules and the collective bargaining
5  agreement, yet Mr. Borgen has been written up several
6  times for going over his allotted time."
7      So in the first sentence when you refer to the
8  recent age discrimination and harassment, are you
9  referring there to the problems with your route?
10     A.  Yes.
11     Q.  Are you referring to anything else?
12     A.  The problems with my route and the harassment
13  from the '98 incident that continued on until that.
14     Q.  From -- after 1998, did anybody ever make any
15  comment to you such as "you're too old to be a UPS
16  driver" or words to that effect?
17     A.  No.  The last one to make a comment was Stan
18  Colton, when he told me the next time he had me in his
19  office he would fire me because I was white.
20     Q.  And when did he make that comment?
21     A.  May of '98.
22     Q.  And was Stan Colton white?
23     A.  Yes.
24     Q.  Did it make sense to you that a white man was
25  saying he was going to fire you because you were white?

**Page 83**

1      A.  No, it totally shocked me.
2      Q.  Do you have any understanding as to why Stan
3  Colton was threatening to fire you because you were
4  white?
5      A.  He had no other reason to fire me, apparently.
6      Q.  Was he threatening to replace you with a
7  minority employee?
8      A.  No.
9      Q.  And after that incident in '90 -- did you say
10  '98 or '99?
11     A.  '98.
12     Q.  Did anyone else ever threaten to fire you or
13  discipline you because you were white?
14     A.  Not because I was white, no.
15     Q.  Did any supervisor at UPS after 1998 threaten to
16  take any disciplinary action against you for any other
17  reason?
18     A.  No.
19     Q.  Well, in paragraph eleven, then, where you're
20  referring to recent age discrimination and harassment
21  occurring just prior to February 27, am I correct that
22  there you're talking about the fact that they wouldn't
23  adjust your route, the time to do your route?
24     A.  The harassment I'm talking about there is the 17
25  or so rides that they had done before that, yeah, before

**Page 84**

1  that.
2      Q.  Okay.
3      A.  And the six rides they did in -- I think it was
4  six rides in January and February.
5      Q.  Of 2003?
6      A.  Yes.
7      Q.  Okay.  And we previously looked at Exhibit 2,
8  which was a ride that was done on October 15, 2002?
9      A.  Right.
10     Q.  Is that one of the rides that you considered
11  harassment?
12     A.  That, yes.
13     Q.  And why did you consider the ride-alongs as
14  harassment?
15     A.  Because normally they ride -- they're supposed
16  to right with you once a year and they were riding with
17  me up to 17, sometimes up to 20 times in a year.
18     Q.  Okay.  And were you the only driver, to your
19  knowledge, who was taking longer than the allocated time
20  for your route?
21     A.  I don't know how to answer that question.
22     Q.  Because you don't know?
23     A.  No.
24     Q.  Well, were you being told by any of the
25  supervisors that the reason they were doing these

**Page 85**

1  ride-alongs was they couldn't understand why it was
2  continually taking you longer than the allocated time to
3  perform your route?
4      A.  Yes.
5      Q.  But you didn't believe them?
6      A.  Pardon?
7      Q.  You didn't believe that that was the reason?
8      A.  That they were riding with me?
9      Q.  Right.
10     A.  No.
11     Q.  You thought they were harassing you?
12     A.  Yes.
13     Q.  You thought they were harassing you to try to
14  get rid of you?
15     A.  Yes.
16     Q.  But it was true, wasn't it, that you were, in
17  fact, taking one to one and a half hours longer than the
18  allocated time to perform your route?
19     A.  No.
20     Q.  That wasn't true?
21     A.  As far as I know, my route was allocated to what
22  I did.  I was taking an hour and a half longer than what
23  the computer said I should do.
24     Q.  Right.  And your supervisors were trying to --
25  they were doing these ride-alongs because they were

22 (Pages 82 to 85)

Case No. A05-056 Civil (JWS)                                    Robert Borgen

Page 86

1  trying to find out why it was taking you longer than what
2  the computer said it should take, right?
3     A. Yes.
4     Q. And isn't it true that when you did those
5  ride-alongs, that you did them within the allotted time?
6     A. No.
7     Q. You say in here that only two drivers were able
8  to complete the route in the allotted time.  Are you
9  talking about two drivers that ran your route?
10    A. Actually two drivers were able to complete the
11 route; they're forced to not do their lunches.  If they
12 completed my route in time, they didn't do their lunches.
13 One of the drivers, Chai Misuk, was told by Rob Hughes
14 the supervisor, not to take his lunch breaks and to run
15 his route as fast as he could.
16    Q. But were these two drivers running your route?
17    A. Yes.
18    Q. Okay.  And why would they be running your route?
19    A. I had the day off or on vacation.
20    Q. And one of those driver's names was Chai Misuk?
21    A. Misuk.
22    Q. How do you spell his last name?
23    A. I don't know, Misuk.
24    Q. Misuk?
25    A. Oriental, spell it Orientally.

Page 87

1     Q. And who was the other driver?
2     A. I don't know the other driver.  Bruce Spencer is
3  one of the drivers and he's currently on the route now.
4     Q. And is Bruce Spencer, what race is he?
5     A. He's white.
6     Q. And how old is Bruce Spencer?
7     A. I don't know.
8     Q. Younger than you?
9     A. Oh, yes, uh-huh.
10    Q. Significantly younger?
11    A. Yeah, probably a good six years or so.
12    Q. And what about Chai Misuk?
13    A. About half my age.
14    Q. Okay.  And you said they were able to do your
15 route in the allotted time, but in order to do that, they
16 had to skip lunch and skip breaks?
17    A. Right.  And come in early and punch off early.
18    Q. You mean they were working off the clock?
19    A. Oh, yeah.  There were 18 to 20 drivers working
20 off the clock every day.
21    Q. And how do you know that they worked off the
22 clock?
23    A. Because they would be working before our start
24 time and they would be punching out before they finished
25 their paperwork.

Page 88

1     Q. So you personally observed them working before
2  they punched in in the morning?
3     A. Yes.
4     Q. Now if you were -- if they were running your
5  route, why would you have been at the station to observe
6  that?
7     A. Well, not only them, I observed other drivers,
8  but I didn't observe Chai coming in or Bruce coming in
9  early and doing my route, because I wouldn't go in there.
10    Q. But you observed other drivers doing this?
11    A. Yes.
12    Q. So if I'm understanding your testimony, you
13 never actually observed Chai or Bruce working off the
14 clock?
15    A. No, they both told me.
16    Q. They told you that?
17    A. Yes.
18    Q. And are they still working for UPS?
19    A. I don't know about Chai.  I know Bruce is.
20    Q. And as far as skipping lunch and skipping break
21 times, I assume you did not personally observe that; is
22 that right?
23    A. No.
24    Q. So how do you know that they skipped lunch and
25 other break times?

Page 89

1     A. They told me.
2     Q. And do you recall when they told you this?  When
3  did they tell you that they had --
4     A. When the last time was or when the first time
5  was?
6     Q. Well, both.
7     A. Last time me and Bruce talked was a few weeks
8  ago and the first time was when he first ran the routes.
9     Q. And when was that?  What year was that?
10    A. I couldn't even begin to go back to say when
11 Bruce first ran my route or when Chai first.  When they
12 first started in.  I believe Chai was 26 or so at that
13 time.
14    Q. And the first time they told you that was 2000,
15 2001, when?
16    A. Who told me?
17    Q. Told you that they were having to skip lunch and
18 work off the clock in order to complete your route in the
19 allotted time.
20    A. Probably the first time was earlier than that.
21    Q. '98, '99?
22    A. Yeah, could have been '98, '99.
23    Q. And did they tell you that continually up until
24 2003 when you left?
25    A. All drivers that have ridden my routes since

23 B 49

23 (Pages 86 to 89)

Case No. A05-056 Civil (JWS)                                        Robert Borgen

Page 90

1  1985 have said that.
2      Q. Have told you that?
3      A. Yes.
4      Q. Any other drivers that told you that other than
5  Chai and Bruce Spencer?
6      A. Told me which, that they worked off their lunch?
7      Q. Right.
8      A. Quite a few of them.
9      Q. And I'm talking about drivers that ran your
10  route.
11      A. Most of the drivers that ran my route had to go
12  without their lunch break.
13      Q. Who else besides Chai and Bruce Spencer?
14      A. You know, I'm not sure all who. I think Bill
15  Moran drove it, Joe Case drove it, and, you know, there's
16  other people. They didn't even -- some of them didn't
17  even take bathroom breaks; they would pee in bottles in
18  the truck and leave the bottle in the back of the truck.
19      Q. All right. So you're being told by other
20  drivers from at least 1998 up until 2003 --
21      A. From 1999.
22      Q. -- since '99, up until when you left in 2003,
23  that -- by these other drivers who ran your route, that
24  they can't do it in the allotted time without skipping
25  breaks, skipping lunch and working off the clock, right?

Page 91

1      A. Yes. Yes.
2      Q. So, did you ever go to the union and say you
3  want to file a grievance because UPS is being unfair to
4  me about the allotted time I have to run my route?
5      A. Yes.
6      Q. And when did you do that?
7      A. Started in the '80s.
8      Q. And did the union ever file a grievance on your
9  behalf?
10      A. No.
11      Q. Do you know why not?
12      A. In the beginning it was because UPS was young,
13  they needed to give them leeway for working and that they
14  were going to straighten out the routes as they hired
15  more drivers.
16      Q. And then was there a different explanation
17  later?
18      A. Each time it was -- it would be a different
19  explanation. Then in '98 when it was agreed that my
20  route was an hour and a half out, I thought it was
21  settled. In January of '99, they dismissed Jay Marshall
22  who made the agreement with me and Carol, put on Rob
23  Tate. He told me that they should never have made that
24  agreement, he wasn't going to abide by it and he started
25  to ride with me. He rode with me and agreed that my

Page 92

1  route was over an hour and fifteen minutes out, then had
2  Rob Hughes ride with me. And when I asked to have the
3  ride lowered down, Rob Hughes said, "We agreed but we
4  didn't agree that we were going to take anything off."
5  And I said, then the -- and the harassment continued.
6  Rather than taking things off, they would just add more
7  work on to my route and make it like it was a joke.
8      Q. So did you go back to the union and complain?
9      A. I went back to the union and complained.
10      Q. How many times did you complain to the union
11  about this?
12      A. I have no knowledge of how many times I
13  complained, but I would complain every few months. They
14  would relax, then start harassing me again. I would
15  complain, they would back off. The union would feel
16  there was no need to pursue it. They would start in
17  again. I would file a complaint through the union asking
18  the steward. He would do the first step of talking with
19  the supervisors. They would back off and then start
20  again.
21      Q. But the union never filed a grievance on your
22  behalf?
23      A. No.
24      Q. Okay. And when you say that after you would
25  complain to the union UPS would back off, what do you

Page 93

1  mean? What did they do to back off?
2      A. They would stop riding.
3      Q. Stop riding with you?
4      A. Stop riding. They wouldn't lower the route.
5  They would just stop riding.
6      Q. And so you would just -- however long it took
7  you to do the route, 12 hours, 16 hours, that's what it
8  took, you got paid for that and they didn't complain
9  about that?
10      A. No.
11      Q. For a few months at least. And then if I'm
12  understanding your testimony, then they would start doing
13  these ride-alongs with you again?
14      A. Yes.
15      Q. Okay. And then when they did the ride-along,
16  would they tell you at that point it was taking you too
17  long to do your route?
18      A. Yes, uh-huh.
19      Q. So what basis would they have for telling you
20  that it was taking too long, if they were doing a
21  ride-along which showed that it actually took 12 to 16
22  hours to do it?
23      A. I --
24      MR. ACKER: Objection. He has no knowledge.
25      Q. You don't know. Look, if you would, at Exhibit

24 (Pages 90 to 93)